# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| JAMES R. CRANMER #00503201, | ) |
| | ) |
| Petitioner, | ) |
| | ) No. 3:16-cv-00725 |
| v. | ) |
| | ) Chief Judge Sharp |
| DEBRA JOHNSON, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM

Petitioner James R. Cranmer, a state prisoner serving an effective sentence of fifteen years for one count of second degree murder and three related felonies, has filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus. (ECF No. 1.) Respondent has filed an answer, along with a copy of portions of the state court record. (ECF Nos. 13, 15, 20.) For the reasons set forth below, the petition will be denied, and this action will be dismissed.

## I. BACKGROUND AND PROCEDURAL HISTORY

On March 26, 2012, judgment entered against Petitioner in the Criminal/Circuit Court of Montgomery County, Tennessee, sentencing him to 15 years in prison upon his guilty plea to one count of second degree murder. (ECF No. 13-1, at 7.) Petitioner also pleaded guilty to one count of attempted second degree murder and two counts of reckless aggravated assault, but lesser prison sentences for those convictions were ordered to run concurrent with the second degree murder sentence, for an effective total sentence of fifteen years. (ECF No. 13-1, at 8–10.) Petitioner did not take a direct appeal.

On October 8, 2012, through new counsel, Petitioner filed a petition for post-conviction relief. (ECF No. 13-1, at 11–36.) An evidentiary hearing was commenced on January 10, 2013, but was adjourned after the testimony of the first witness. (ECF No. 13-2, at 1–28.) Petitioner's original post-conviction counsel was disqualified from the case due to her previous partnership

with trial counsel during part of Petitioner's representation (ECF No. 13-1, at 123–24), and substitute counsel was retained and filed an amended petition. (ECF No. 13-1, at 125–34.) The evidentiary hearing reconvened on September 12, 2013, and closing arguments were heard on November 21, 2013. (ECF No. 13-2, at 34; ECF No. 13-3.) The post-conviction court entered an order denying relief on November 26, 2013. (ECF No. 13-1, at 137–51.) Petitioner appealed, and the Tennessee Court of Criminal Appeals (TCCA) affirmed the denial of relief on April 23, 2015. (ECF No. 13-9.) The Tennessee Supreme Court denied permission to appeal on September 17, 2015. (*Id.*).

Petitioner asserts that he submitted his *pro se* habeas corpus petition to be mailed to this Court on April 1, 2016, and Respondent does not dispute that it is timely or that the claims raised are exhausted. (ECF No. 15, at 1–2.) Respondent filed an answer to the petition on July 14, 2016, and has filed portions of the state court record. (ECF Nos. 13, 15, 20.) The matter is ripe for review.

## II. STATEMENT OF FACTS

For its summary of the facts of the case, the TCCA quoted the following recitation made by the prosecutor at the plea hearing:

> The facts of this case are that on the morning of February 6, 2011, the [Petitioner] and a number of individuals were at the Flavors (phonetic) After Hours Club in Clarksville, Montgomery County. The [Petitioner] and a Mr. Lionel Watkins, who is the victim in Count two, got into an argument. The [Petitioner] challenged Mr. Watkins and Mr. Watkins struck the [Petitioner]. After being struck, the [Petitioner] pulled a gun and started shooting and shot and killed Detwain Bell (phonetic), struck Mr. [Bell] right in the chest and he died extremely quickly from those injuries. The [Petitioner] continued to fire, struck Mr. Watkins twice, once in the hand and once in the back. Mr. Watkins suffered some very serious injuries, life-threatening injuries and still has ongoing problems from those. He also struck Ms. Jaquita Murray (phonetic) in the leg and Ms. Jamaine Thompson (phonetic) in the leg. There were numerous witnesses at the club, [there] was over a hundred people in there. Several [witnesses] have identified the [Petitioner] as the individual that was shooting and that fled from the scene and ... later we found him, actually using ping tracing to locate him and found him up in Kentucky hiding from the police three days after the shooting occurred.

*Cranmer v. State*, No. M201302866CCAR3PC, 2015 WL 1868815, at *1 (Tenn. Ct. Crim. App. Apr. 23, 2015), *appeal denied* (Tenn. Sept. 17, 2015).

## IV. ISSUES PRESENTED FOR REVIEW

Petitioner raises three claims in his habeas petition:

1. His guilty plea was not knowing and voluntary because the state withheld *Brady* material until after he entered his plea. (ECF No. 1, at 10.)

2. Trial counsel was ineffective for failing to timely convey the state's offer of an agreed withdrawal of his guilty plea based on the late-disclosed information. (ECF No. 1, at 12.)

3. Trial counsel was ineffective for failing to investigate multiple exculpatory leads, for failing to file pre-trial motions or motions in limine, and for failing to advise him that recordings of jailhouse telephone calls are inadmissible at trial. (ECF No. 1, at 12.)

## V. STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in

the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court concludes that the decision is erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12. Under this standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Similarly, a district court on habeas review may not find a state court factual

4

determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

## VI.   ANALYSIS AND DISCUSSION

### A.   Claim 1

In pretrial discovery, the state provided Petitioner with a statement from a witness who described the shooter as a white male. During trial preparation, the same witness told the prosecutor that the shooter was light-skinned rather than white. However, the prosecutor did

5

not share the witness's latter comment until two days after Petitioner had entered his plea, at which time he offered to agree to Petitioner's withdrawing his guilty plea. (ECF No. 13-4, at 49.) Petitioner claims that the prosecutor thus violated the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), and prevented his plea from being voluntary, in violation of his right to due process.

The post-conviction court denied relief on this claim, and the TCCA affirmed based on the following analysis:

> The Petitioner contends that "the [post-conviction] court erred in failing to permit withdrawal of [the] Petitioner's plea even absent a finding of ineffective assistance of counsel, as the evidence showed that the prosecution withheld evidence in violation of *Brady v. Maryland*, [373 U.S. 83 (1963)], and [the] Petitioner's plea was not knowing, voluntary, and intelligent." The State responds that the Petitioner has failed to prove a *Brady* violation because he has not demonstrated that the evidence withheld was material, and he cannot demonstrate a "reasonable probability" that the results of his proceeding would have been different had it been disclosed.
>
> When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Ct. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Ct. Crim. App. 1990). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). A petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).
>
> Two days after the Petitioner entered his guilty plea, the State admitted that it had failed to disclose a statement made by the club security guard that the shooter was not white but "light skinned." Based on its withholding of the potentially exculpatory evidence, the State offered to allow the Petitioner to withdraw his guilty plea. Counsel informed the Petitioner of the State's offer, and, after discussing it with Counsel and his family, the Petitioner decided not to withdraw his plea. Any *Brady* violation committed by the State was remedied by its subsequent offer to the Petitioner.
>
> As to his contention that he should be allowed to withdraw his plea because it was entered involuntarily, we reiterate that the Petitioner was given the opportunity to do so. The post-conviction court found that the Petitioner did not tell Counsel that he wanted to withdraw his plea. Counsel testified that she would

> have withdrawn the Petitioner's plea if he had requested her to do so, or if had she erroneously relied on his mother's information that he wanted to withdraw his plea, she would have gone to the judge and said the same. Counsel testified that the Petitioner signed a document saying he did not want to withdraw his plea. The post-conviction court accredited Counsel's testimony.
>
> Based upon our review of the record, we conclude the Petitioner received the effective assistance of counsel and knowingly and voluntarily entered his plea. We further conclude that it was the Petitioner's decision not to withdraw his plea. We affirm the judgment of the post-conviction court. The Petitioner is not entitled to relief.

*Cranmer v. State*, No. M201302866CCAR3PC, 2015 WL 1868815, at *11–12 (Tenn. Ct. Crim. App. Apr. 23, 2015), *appeal denied* (Tenn. Sept. 17, 2015).

As explained above, because the state court rejected Petitioner's claim on its merits, he has the burden of establishing that the rejection was based on an unreasonable determination of the facts or is contrary to or an unreasonable application of federal law as announced by the Supreme Court. 28 U.S.C. § 2254(d). Petitioner has not satisfied this burden for this claim, and there is no way he could do so in light of the applicable federal law. The Supreme Court has expressly rejected the notion that a guilty plea is not voluntary where *Brady* impeachment material is not disclosed before the plea. *See United States v. Ruiz*, 536 U.S. 622, 628 (2002). The Court explained that the right to receive such information is part of the constitution's "basic 'fair trial' guarantee," but that "[w]hen a defendant pleads guilty he or she, of course, forgoes not only a fair trial, but also other accompanying constitutional guarantees." *Id.* It distinguished between the fairness of a trial and the voluntariness of a plea, and concluded that a plea may be entered voluntarily without a defendant's knowledge of *Brady* material, just as the constitution permits entry of a plea where the defendant does not have an accurate understanding of the strength of the prosecution's case, the likely penalties involved or the admissibility of certain evidence. *Id.* at 620–30.

*Ruiz* involved witness impeachment material, and circuits are split on whether independently exculpatory *Brady* material must be disclosed before a plea, with the Sixth Circuit

7

having thus far declined to answer that question. *Robertson v. Lucas*, 753 F.3d 606, 621 (6th Cir. 2014). The split among circuit courts, however, indicates that "fairminded jurists could disagree" about whether Petitioner was entitled to receive all exculpatory material before his plea. *See Little v. Warren*, No. 2:14-CV-10166, 2015 WL 6108248, at *6 (E.D. Mich. Oct. 16, 2015) ("[T]he circuit court split on the issue . . . indicates that the state court's decision in this case was not an unreasonable one; at most, it is one upon which 'fairminded jurists' could disagree.") (citing *Harrington v. Richter*, 562 U.S. at 101). Therefore, any such right was not "clearly established" enough permit habeas relief from the state court's finding that Petitioner's plea was voluntary despite the non-disclosure. *See Carey v. Musladin*, 549 U.S. 70, 76–77 (2006) (noting that lower courts' wide divergence on a claim reflected "lack of guidance" from Supreme Court, and accordingly "it cannot be said that the state court unreasonably applied clearly established Federal law"); *Evenstad v. Carlson*, 470 F.3d 777, 783 (8th Cir. 2006) ("When the federal circuits disagree as to a point of law, the law cannot be considered 'clearly established'...."); *cf. Robertson* at 621 (holding that defendants to civil rights suit were entitled to qualified immunity because plaintiff arrestees did not have a "clearly established" right to receive exculpatory material prior to their guilty pleas); *Snow v. Nelson*, 634 F. App'x 151, 156 (6th Cir. 2015) ("As we held in *Robertson v. Lucas*, our precedent does not support any clearly established right of criminal defendants to receive exculpatory *Brady* material before plea bargaining."). *But see Hall v. Zenk*, 692 F.3d 793, 799 (7th Cir. 2012) ("The fact that a circuit split exists on an issue may be indicative of a lack of clarity in the Supreme Court's jurisprudence, but a split is not dispositive of the question.") (citations omitted).

Moreover, while actual "misrepresentations or other impermissible conduct by state agents" might violate the due process requirement that a guilty plea be "a voluntary and intelligent choice," the remedy for that violation is withdrawal of the plea. *Robertson* at 620 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) and *Brady v. United States*, 397 U.S.

8

742, 757 (1970)). As determined by the state court and discussed further below, Petitioner knowingly waived any right to that remedy when he instructed counsel not to move to withdraw his plea after the prosecutor agreed to allow him to do so.

Petitioner has not established that he is entitled to relief on this claim, and it will be denied.

### B.     Claim 2

Petitioner next claims that his trial counsel was ineffective for "failure to timely convey and communicate an offer by the state to permit withdrawal of a plea based on undisclosed *Brady* evidence." (ECF No. 1, at 12.)

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To satisfy the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. In assessing counsel's performance, a reviewing court must be highly deferential and avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court must determine whether, under the circumstances, counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690. In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

9

The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

The two-part *Strickland* test applies equally to ineffective-assistance claims in the context of guilty pleas. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). To satisfy the first prong in such a case, a petitioner must establish that counsel's advice concerning the plea was not "within the range of competence demanded of attorneys in criminal cases." *Id.* at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970) and citing *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)). To establish prejudice, a petitioner who pleaded guilty "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

As discussed above, however, federal habeas relief may not be granted on an exhausted claim under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on

an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

Reviewing this claim on appeal from the denial of post-conviction relief, the TCCA correctly identified the applicable *Strickland* standard. *Cranmer v. State*, No. M201302866CCAR3PC, 2015 WL 1868815, at *10–11 (Tenn. Ct. Crim. App. Apr. 23, 2015), appeal denied (Sept. 17, 2015). It recounted the relevant post-conviction testimony from plea counsel, Petitioner and his mother, and rejected the claim on its merits:

> Counsel testified that, after the Petitioner entered his guilty plea, she was in communication with the State about the Petitioner withdrawing the plea. Counsel agreed that on March 28, 2012, two days after the Petitioner entered his guilty plea, she learned from the State that the club's security guard, Mr. Galbreath, had made a statement that the shooter was not a white male but was "light skinned." Because that created some doubt about the Petitioner's role in the shooting, the State offered to give the Petitioner thirty days to withdraw his plea. Counsel stated that she communicated this information to the Petitioner on April 4 or 5, 2012. Counsel stated that she attempted to contact Mr. Galbreath, as well as Ms. Murray again, to attempt to get more information about the incident for the Petitioner. Counsel's investigation and conversations with the State continued through the middle of April, during which time the Petitioner communicated ambivalence about whether to withdraw his plea. Counsel said he was concerned about the witnesses, Ms. Murray and Mr. Galbreath, and wanted to know if the new information from Mr. Galbreath might benefit the Petitioner's case. Counsel advised the Petitioner that she did not think what Mr. Galbreath

11

said would "hurt [the Petitioner's] chances and or help[ ] his chances in any way...." Counsel stated that the Petitioner eventually signed a document stating that he did not want to withdraw his plea. Counsel clarified that the document read: "I do or do not want her to file a motion to withdraw my plea," and the Petitioner circled, "do not."

Counsel testified that she left town after the Petitioner made his decision not to withdraw his plea. The Petitioner seemed unsure about his decision and wanted to talk it over with his family. Before leaving town, Counsel advised the Petitioner of her out of town trip. She explained to him that she would be available by phone but could not visit him again at the jail to discuss his decision. While Counsel was out of town, the Petitioner's mother called her and said that the Petitioner did not want to withdraw his plea. Upon Counsel's return, she sent a follow-up letter to the Petitioner to close her file and received a letter from the Petitioner in response stating that he wanted to withdraw his plea. Counsel visited the Petitioner in jail to discuss the letter he sent to her and again he signed a document stating that he did not wish to withdraw his plea.[1] Counsel told the Petitioner that she could try to contact the State about withdrawing his plea outside the thirty-day period.

Counsel testified that if she had incorrectly relied on the Petitioner's mother in her thinking that the Petitioner did not want to withdraw his plea, she would have gone to the trial court and the State and said the same. However, the Petitioner continued to state that he did not want to withdraw his plea. He also never indicated that he wanted to hire another attorney even though Counsel advised him that he could retain a different attorney.

\*       \*       \*

Ms. Cranmer agreed that Counsel contacted her after the Petitioner entered his guilty plea and told her the State had offered to allow the Petitioner to withdraw the plea due to exculpatory evidence that the State had not provided the Petitioner. Ms. Cranmer said that she told Counsel that her son wanted to withdraw the guilty plea and that she wanted to meet with Counsel, who was out of town at the time.

\*       \*       \*

The Petitioner recalled that after he entered his plea, he learned from Counsel that the State had "unintentionally withheld some evidence" and that the State had offered to allow the Petitioner to withdraw his plea. Counsel advised him to

---

[1] The TCCA's summary suggests that Petitioner signed documents at different times stating that he did not want to withdraw his plea. The testimony indicates, however, that as of his mid-April meeting with counsel, Petitioner was still undecided about whether to withdraw his plea, and that the meeting was followed by verbal communication through Petitioner's mother (ECF No. 13-2, at 120–27), counsel's May 9 letter to confirm Petitioner did not want to withdraw the plea (ECF No. 13-4, at 53), his May 10 letter that he had told his mother to tell counsel to withdraw his plea (ECF No. 13-4, at 85–86), and another meeting on May 16, at which he signed the statement that he did not want counsel to file a motion to withdraw after all. (ECF No. 13-4, at 55.) While the TCCA may have been in error on this detail, in light of the other relevant evidence supporting the state court's decision, this Court cannot conclude that the rejection of Petitioner's claim was "based on" that error as required for relief under § 2254(d)(2).

"be careful" about withdrawing his plea because it was possibly a ploy by the State to have a trial resulting in a lengthier sentence. The Petitioner recalled that he had discussions and communication with Counsel about his decision but denied telling her that he did not want to withdraw his plea. He said that Counsel gave him a document to sign stating that he did not want to withdraw his plea, and he refused to sign it. He clarified that he signed a document stating that he did not want Counsel to withdraw his plea because he planned to hire another attorney.

\* \* \*

In the matter at hand, the post-conviction court accredited Counsel's testimony and found that the Petitioner was not credible. . . . Finally, the post-conviction court concluded that it was the Petitioner's decision not to withdraw his plea and that Counsel communicated with him effectively on that issue. The post-conviction court found that the Petitioner's allegation in regard to the withdrawal of his plea was "completely erroneous."

We conclude that the evidence does not preponderate against the post-conviction court's findings. . . . Counsel further testified that she gave the Petitioner advice about whether to withdraw his guilty plea and he ultimately declined the State's offer. The post-conviction court accredited Counsel's testimony, thereby resolving all factual issues raised by the evidence. *See Momon* [*v. State*], 18 S.W.3d 152[,] 156 [(Tenn. 1999)]. We conclude that the Petitioner has failed to meet his burden of showing by clear and convincing evidence that Counsel was ineffective. He is not entitled to relief on this issue.

*Cranmer v. State*, No. M201302866CCAR3PC, 2015 WL 1868815, at *5–6, 7, 11 (Tenn. Ct. Crim. App. Apr. 23, 2015), appeal denied (Sept. 17, 2015).

Petitioner pleaded guilty on March 26, 2012, and the prosecutor contacted counsel on March 28, 2012, about the discrepancy in Galbreath's description of the shooter. (ECF No. 13-4, at 49.) Petitioner's claim is that counsel did not "timely" communicate the prosecutor's offer to agree to withdrawal of his plea (ECF No. 1, at 12), but the letter he wrote to her on April 5, 2012, indicates that she had come to talk to him about the possibility of withdrawing his plea "last Sunday," which would have been Sunday, April 1, 2012 – only four days after the prosecutor's disclosure. (ECF No. 13-4, at 88.) At Petitioner's request, counsel then spoke with Galbreath and met again with Petitioner to advise him that she did not believe the newly disclosed statement had any impact on Petitioner's case; Petitioner acknowledged in his post-conviction appellate brief that this meeting took place in mid-April, just as counsel had testified at the

13

hearing. (ECF No. 13-2, at 122; ECF No. 13-7, at 54–55.) Petitioner's state court brief and another letter to counsel also acknowledged that at that point, Petitioner wanted to give more thought to whether to withdraw his plea, but counsel was leaving town and would be unable to return to discuss the matter in person, so they agreed that he would have his mother let her know whether or not he wanted to withdraw his plea. (ECF No. 13-4, at 85–86; ECF No. 13-7, at 54–55.) While there is a factual dispute about what message Petitioner's mother conveyed to counsel about his decision, there is clearly no merit to his allegation that counsel's communication with him about the option to withdraw his plea was not timely. That claim will therefore be denied.

To the extent that Petitioner is trying to claim that counsel was ineffective for failing to act on his directive, either personal or through his mother, that he wanted to withdraw his plea based on the newly disclosed evidence, the TCCA summarized the conflicting post-conviction testimony on that question, and observed that "the post-conviction court accredited Counsel's testimony and found that the Petitioner was not credible." *Cranmer*, 2015 WL 1868815, at *11. Specifically, "the post-conviction court concluded that it was the Petitioner's decision not to withdraw his plea and that Counsel communicated with him effectively on that issue," and that "Petitioner's allegation in regard to the withdrawal of his plea was 'completely erroneous.'" *Id.* The TCCA concluded that "the evidence does not preponderate against the post-conviction court's findings." *Id.*

The state court's factual determinations are presumed to be correct and may only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Moreover, to warrant habeas relief, it is not enough that a federal district court disagree with the state court's factual determination or believe it to be erroneous; the determination must be "unreasonable." 28 U.S.C. § 2254(d)(2). Witness credibility assessments are "predominately the business of trial courts," and "federal habeas courts do not have license, under § 2254(d), to redetermine

14

witness credibility, whose demeanor is observed exclusively by the state court." *Givens v. Yukins*, 238 F.3d 420 (6th Cir. 2000) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

In this case, Petitioner has not established any clear and convincing evidence that renders unreasonable the state court's determination that his claim to have wanted or instructed his attorney to withdraw his plea was not credible, or "completely erroneous." Both the relevant testimony and documentary evidence conflict, and the state courts did not unreasonably choose one side over the other.

It is undisputed that on May 9, 2012, after a telephone conversation with Petitioner's mother, counsel wrote Petitioner a letter to "confirm that after our discussions, and after you speaking with your family, you have elected NOT to withdraw your guilty plea." (ECF No. 13-4, at 53.) Petitioner responded in a letter dated May 10, 2012, saying that he had told his mother to tell her he wanted to withdraw his plea (ECF No. 13-4, at 86), but it is also undisputed that when counsel visited Petitioner on May 16 to discuss his letter, he signed a statement saying that he did not want her to file a motion to withdraw his plea. (ECF No. 13-4.) Petitioner tried during post-conviction proceedings to convince the state court that in signing the statement, he meant only that he did not want **plea counsel** to file the motion, because he had lost faith in her by then and was retaining another attorney to do so. (ECF No. 13-2, at 232–33; ECF No. 13-7, at 56.) He testified that before counsel visited him on May 16, his family was already in the process of arranging for another attorney, Carrie Gasaway, to move to withdraw his plea. (ECF No. 13-2, at 232–33.) In addition to the reasons given by the state court, its decision to disbelieve Petitioner's version of events is supported by the fact that, despite Petitioner's knowledge that the prosecution's offer was only good for a limited time (ECF No. 13-2, at 233), he never actually had Gasaway file a motion to withdraw the plea or take any action to challenge Petitioner's conviction until she filed his initial post-conviction petition almost five months later, on October 8, 2012. (ECF No. 13-1, at 36.)

Moreover, neither the initial petition drafted and filed by Gasaway, nor the affidavit of Petitioner's mother in support of that petition, alleged that Petitioner had ever informed counsel that he wanted to withdraw his plea. (ECF No. 13-1, at 23–24, 39.) To the contrary, the petition expressly alleged that upon receiving counsel's letter "to confirm" that he did not want to withdraw his plea, "[Petitioner] was very upset because **he had not yet communicated to [counsel] whether he wanted to withdraw his plea or not**." (ECF No. 13-1, at 23–24 (emphasis added).) More than six months later, in the course of litigating the motion to disqualify Gasaway from the post-conviction case, Petitioner – through Gasaway – filed a response with the stated purpose of challenging plea counsel's credibility. (ECF No. 13-1, at 60–64.) In the response, Petitioner alleged discrepancies and falsehoods in plea counsel's billing records and sworn affidavit testimony, but never mentioned any discrepancy between an alleged instruction (through his mother) for her to withdraw his plea and her attempt to confirm that he did not want to withdraw his plea. (*Id.*) Even in Petitioner's amended petition filed in August 2013, there was still no mention of any instruction through his mother to withdraw the plea – just counsel's attempt to "confirm" his desire not to withdraw his plea after his saying that he needed more time to think about it. (ECF No. 13-1, at 130.) Thus, by the time of the relevant post-conviction testimony in September 2013, the very newness of Petitioner's allegation that he had actually instructed counsel to withdraw his plea further supported the state court's finding that it was not credible.

Petitioner has not established that the state court's rejection of this claim was contrary to or an unreasonable application of federal law. Accordingly, it will be denied.

**C.     Claim 3**

Finally, Petitioner claims that plea counsel was ineffective for failing to investigate multiple exculpatory leads, failing to file motions and failing to advise him that jailhouse phone

16

call recordings were not admissible at trial. As discussed above, the state court identified and applied the proper federal standard for ineffective-assistance claims.

Petitioner does not identify the "multiple exculpatory" leads that he faults counsel for not investigating. In his post-conviction appeal, he complained of the failure "to contact key witnesses who would have potentially corroborated Petitioner's innocence," and specifically mentioned Jaquita Murray, Michael Taylor, Jumain Thompson and Lionel Watkins. (ECF No. 13-7, at 19–20.) But with the exception of Ms. Murray, Petitioner has never presented evidence of what further investigation would have revealed about those individuals' information about the case or their anticipated trial testimony. Ms. Murray testified at the post-conviction hearing that Petitioner was the man who shot her and "was the only white person in that club that night with that hoodie on," and also confirmed that she had refused to speak to Petitioner's attorney. (ECF No. 13-2, at 12-13, 19, 21.)

Counsel's unrebutted testimony was that in addition to Ms. Murray, she had tried and failed to talk to Watkins, and that she was sure she probably tried to contact Thompson and Taylor as well, but did not specifically recall those efforts. (ECF No. 13-2, at 46–47.) Through her trial preparation and review of the discovery, counsel was already aware of Murray's and the other victims' statements and the fact that they had not positively identified Petitioner as the shooter. (ECF No. 13-2, at 49–54.) However, Thompson had said that "out of nowhere a caucasian male" had thrown a punch just before the shooting began (ECF No. 13-2, at 18), and Taylor had said that a "white boy" had come in with a gun and "just started shooting." (ECF No. 13-2, at 23.) Even if counsel's investigation of these victims or other witnesses or pieces of evidence was deficient, Petitioner has not demonstrated what additional investigation would have revealed or that there is a reasonable probability that it would have caused him to reject the plea agreement. He has therefore not proven any prejudice arising from the allegedly deficient investigation. *Cf. Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) (where habeas

17

petitioner did not establish the likely content of missing witness's testimony, "*a fortiori*, he cannot show that he was prejudiced by its omission").

With regard to the allegedly ineffective failure to file pre-trial motions, the TCCA quoted the post-conviction court's rejection of this claim: "There was no showing that there were any motions that needed to be filed. [Counsel] had the discovery. There was no evidence presented in the hearing of this case that demonstrated that there was any evidence that could have been suppressed." *Cranmer v. State*, No. M201302866CCAR3PC, 2015 WL 1868815, at *8 (Tenn. Crim. App. Apr. 23, 2015), *appeal denied* (Tenn. Sept. 17, 2015). The petition in this action fails to specify what motions counsel was ineffective for failing to file, except for a reference to Petitioner's having been prejudiced by counsel's "failure to file a motion limine or even advise Petitioner that jail call recordings would be inadmissible at his trial." (ECF No. 1, at 12.) But Tennessee law is clear that inmates who are aware that jailhouse phone calls are recorded[2] have no legitimate expectation of privacy in those calls, and the recorded calls are admissible in court. *State v. Hill*, 333 S.W.3d 106, 125–26 (Tenn. Ct. Crim. App. 2010).

It is possible that Petitioner is attempting to raise an argument he raised on post-conviction appeal: that counsel failed to advise him that portions of the calls related to his polygraph test would not be admissible at trial and was ineffective for advising him that his chances at trial were damaged by evidence that she should have known was not admissible. (ECF No. 13-7, at 35, 38–39.) Tennessee law does prohibit admission of evidence of a defendant's taking, willingness to take or refusal to take a polygraph. *State v. Sexton*, 368 S.W.3d 371, 409 (Tenn. 2012). Counsel was aware of that law, and testified that she advised Petitioner's family accordingly. (ECF No. 13-2, at 94.) However, Tennessee does not exclude evidence of voluntary statements, made either during a polygraph or after a polygraph machine

---

[2] Petitioner's using another inmate's PIN to place his calls in order "to keep the district attorney from knowing about the lie detector test" establishes that he knew the jail staff and/or prosecutor could hear jailhouse phone calls. (ECF No. 13-2, at 219.)

is disconnected, about the defendant's answers during the polygraph or the underlying facts of the crime, because such statements are "by definition . . . separate and discrete" from the polygraph test or test result itself. *State v. Damron*, 151 S.W.3d 510, 513–14, 517–18 (Tenn. 2004). "[T]he fact that a polygraph test is not sufficiently reliable to warrant admission of its results does not undermine the reliability of voluntary statements made by a defendant during a polygraph test." *Id.* at 517. This is equally true for voluntary statements made by a defendant to his family members hours or days after the test. Thus, hypothetically speaking, while a defendant's telling a family member during a phone conversation that he was taking a polygraph or that he had failed a polygraph would not be admissible, his telling a family member that he intended to lie or had lied during a polygraph by denying that he committed a crime may be admissible. It is Petitioner's burden to establish on which side of that line the evidence in question falls in order to demonstrate that his counsel's performance was deficient, and he has failed to do so. As Petitioner himself observed in his post-conviction appellate brief, the records of the damning phone calls were never entered into the state court's record. (ECF No. 13-7, at 37.) In the absence of that evidence, Petitioner cannot prove either that counsel performed deficiently in failing to move to exclude it or to advise him of that possibility, or that the impact of the evidence was so significant that there is a reasonable probability that he would have rejected the plea deal if he knew it might be inadmissible. The relative impact of the conversations related to the polygraph is particularly speculative given that Petitioner's decision to take the plea was also influenced by the prosecutor's possession of call recordings in which Petitioner and/or his mother arguably threatened a witness via a three-way call using another inmate's PIN, and recordings in which Petitioner had shared the entire defense strategy for trial. (ECF No. 13-2, at 105-06, 163–64, 225.)

Petitioner has not established that the state court's rejection of this ineffective-assistance claim was contrary to or an unreasonable application of clearly established federal law. The claim will be denied.

**VII.     CONCLUSION**

For the reasons set forth above, the petition for the writ of habeas corpus will be denied, and this case will be dismissed.

An appropriate Order shall enter.

                                          Kevin H. Sharp, Chief Judge
                                          United States District Court